Earl, J.
The testator died on the 3d day of June, 1886, leaving one descendant, a son, and leaving a will in which the defendant was appointed executor.
In September, 1889, the plaintiff presented a claim against the estate of the testator for $20,000, which, in her verified statement thereof, was described as follows: “ Said Harry E. Dodge, deceased, in or about the year 1886, was the owner of the premises No. 278 Henry street in the city of Brooklyn, upon which said premises there was a mortgage of $20,000, owned by and belonging to me, and that in or about the month of May, 1886, said Harry E. Dodge, deceased, sold said premises, and at his request I executed a satisfaction piece of the said mortgage with the under *555 standing and agreement that said Dodge would pay me the amount of said mortgage upon receiving the consideration price of said premises from the purchaser thereof, whereupon thereafter he gave me a check for the face of said mortgage, to wit, the sum of $20,000, which said sum has never been paid to me and against which there are no offsets or counterclaims of any name or nature whatsoever.” This claim was disputed by the defendant, and was then by consent referred to Albert E. Lambe to hear and determine the same. The case was brought to trial before the referee, and he made his report, deciding it in favor of the defendant, dismissing the claim. His report was confirmed and judgment was entered thereon in favor of the defendant. From that judgment the plaintiff appealed to the general term, and there the judgment was reversed upon the facts and a new trial was ordered before another referee. Thereafter James McKeen was appointed referee and the case was again brought to trial before him, and upon substantially the same facts as had appeared upon the first trial he made his report dismissing the claim, and his report was confirmed and judgment was entered thereon. From that judgment the plaintiff again appealed to the general term, and it reversed the judgment upon the facts, and holding that the case was a plain one for the plaintiff, and could not be materially changed upon a new trial, it ordered judgment for the plaintiff for the amount of her claim, with interest and costs, amounting in all to upwards of $28,000. From that judgment the defendant has appealed to this court.
We are not able to .take the same view of the evidence in this case as that which found favor with the learned general term. We could rest our decision upon the able opinion of the referee before whom the case was last tried, and find therein ample justi-" fication for the conclusion we have reached. But the amount involved is so large, and the difference between the two referees and the general term is so wide and emphatic that it is most proper that we should give our own reasons for our judgment.
Harry E. Dodge was a widower, and for some years before his death had been a member of the Wall street banking firm of Clark, Dodge & Co. At his death he was apparently worth, over and above all his debts, aside from this claim of the plaintiff, nearly $200,000. He became acquainted with the plaintiff, who was then a widow, at least as early as August, 1877. Her name was then Mrs. Miner, she having since the death of Mr. Dodge been married to Mr. Van Slooten. Soon after their acquaintance, the plaintiff and Dodge commenced to live together in Brooklyn, first at the house of one of the plaintiff’s witnesses, Mrs. Chertizza, then at a house in Livingston street, and then in her house in Sidney place, where he died. On the 11th day of March, 1882, he gave her his bond and a mortgage upon a house in Henry street to secure the payment to her of the sum of $20,000 on demand, with interest from the date thereof. He had a shock of paralysis on the 14th day of April, 1886, another on the 7th day of May and a third on the day of his death. The mortgage remained on the house at Sidney place until April 21r *556 1886, seven days after the first shock of paralysis, when she sent it to her attorney with the request that it should be recorded, and he caused it to be recorded on that day. There is nothing to show what the consideration for that mortgage was, and it is very doubtful whether it had any consideration. If it had been given for money borrowed or for property purchased, we see no reason to doubt that the fact could have been proved. Why did Mr. Dodge, a rich man, give the mortgage? Why was it made payable “on demand,” witli interest from date? Why was it permitted to slumber four years without record ? Why was it, after slumbering so long, recorded soon after the attack of a disease usually fatal? During these four years it does not appear that any interest was paid upon the mortgage, and the bond and mortgage when delivered to her attorney for record contained no indorsements of the payments of interest. If the interest had been paid, as it probably would have been upon a subsisting, .vital obligation, it is quite probable that some at least of the payments could have been proved. But this is not all.
The very next day after the record of the mortgage she executed a satisfaction piece certifying that the mortgage had been paid, and it was on that day discharged of record. The satisfaction piece was drawn and the acknowdedgment thereof was taken by her attorney, who had the mortgage recorded. Why was the mortgage placed upon record one day to be satisfied and canceled the next? What transpired between the record of the mortgage at three o’clock P. M. of one day and its satisfaction on the next day ? If the mortgage was for any reason to be so soon satisfied, why was it not torn up or simply canceled in some way before its record ? And what possible reason could there be for ‘recording it ? .A not improbable explanatibn is that the mortgage was recorded in violation of some understanding between the parties, and that when Mr. Dodge learned of it he required its cancellation. Mr. Dodge sold and conveyed the Henry street real estate on the 1st day of May for $15,750, and thus we have the fact that the mortgage was for $4,250 more than the value of the property, and this militates somewhat against the theory that the mortgage was a bona fide mortgage to secure a real debt. She alleges in the verified statement of her claim that she satisfied the mortgage upon an agreement with Dodge that he should pay her the amount of the mortgage upon the receipt by him of the purchase price of the property when sold. We must assume that he received the purchase price in cash, because if he did not it was easily susceptible of proof. What did he do with the money ? If he had deposited that amount in the bank of his firm or in any other bank, that could have been proved. She alleges that he was to pay her mortgage with the proceeds of the sale. Did he not do it ? And if he did not, what became of the money? She says he then agreed to pay her, and if the mortgage was a valid, subsisting obligation, why did he not do it? She says he did not pay her, and if he did not, the probability is that the mortgage was given for some undisclosed purpose and was not intended as a subsisting obligation. We are dealing with probabilities. He *557 being dead, and her mouth being closed by the statute, we must ascertain as well as we can where the balance of the probability is. The bond and mortgage have disappeared. She says that she never received them back from her attorney, to whom she had delivered them for record. He testified that he delivered them back to her. What became of them ? Were they not destroyed as useless or as paid obligations? She bases her claim entirely upon the bond and mortgage, and she must show affirmatively that at the time of his death the amount named in them was actually unpaid and due to her.
In the satisfaction piece she acknowledges that it was paid, and that acknowledgment is prima facie evidence that it was paid, and that she received the money, Sheldon v. Sheldon, 133 N. Y., 1; 44 St. Rep., 260, and she was bound to show affirmatively that that acknowledgment was untrue. This she attempts to do by showing that Mr. Dodge, some time in the month of May, gave her a check for $20,000 upon the firm of Clark, Dodge & Co. The referee found that this check was actually given some time in May. Whether it was given before or after the second stroke of paralysis is uncertain. It was given about that time. If it was intended thereby to pay the amount due upon the mortgage, why was it not given at the time the mortgage was discharged of record ? And why, if the mortgage was a real security, did the check not include some interest? If the check was intended for the payment of the mortgage, why did she not demand the money on it before or after the death of Mr. Dodge? She was familiar with business, and with the nature and purpose of checks, and knew how to draw money on them. She never presented it to the drawees for payment, and she was not able to produce it upon the trial of the action. That, like the bond and mortgage, had disappeared. She came before the referee without a particle of written evidence to sustain her large claim. She testified that she had the check at the time of the death of Mr. Dodge, and that a few days thereafter she delivered it to the defendant in a sealed envelope, saying to him that it contained a check of $20,000, given to her by Mr. Dodge for the payment of the mortgage, and that he told her that if she did not “ collect the check ” before he died she should give it to Mr. Wheeler, and let him “collect it ” for her. This is a singular story. Mr. Dodge gave her the check not in the immediate presence of death. If the money was not to be presently paid, why did he not give her his note ? If the check was actually for the payment of money due her, what reason had he to suppose that she would not draw the money in his lifetime? Would a business man speak of “collecting” the money on a check? Why should he direct her to deliver it to his executor for collection when all she had to do was to go to the drawees and get the money ? Why did she, with her knowledge of business, surrender to the defendant the only written evidence of her large claim without taking any voucher for the same ?
The defendant absolutely denied this story; denied that she *558 ever mentioned the check to him; denied that he ever had it in his possession; denied that he ever heard of it until more than two years after the death of Mr. Dodge. Which of these two is to be believed? She is greatly interested. He is absolutely without any interest or temptation to pervert the truth. He appears to be a man of great respectability and high character. There is absolutely no reason for discrediting his evidence. He belongs to a firm of dry goods commission merchants doing business in New York and Boston. He has been named as executor of several estates. He is a director of the Hamilton Loan & Trust Company, and of the National Citizens’ Bank of New York, and of the American District Telegraph Company of Brooklyn, a trustee of the Hnion Dime Savings Institution of New York and a member of the Chamber of Commerce of New York. The testator named him in his will as executor and as trustee for his son,-thus certifying to his integrity and respectability. What possible reason can there be for not believing him in a case where he cannot be mistaken and where he tells the truth or commits perjury?
Prior to December 24th, 1884, Mr. Dodge had made a will, but we do not know what its provisions were. On that day he made another will, the provisions of which were, in all respects, like those in his last will, except that in the former will he gave the plaintiff $15,000, and in the last will he made the defendant sole executor and trustee. The last will was executed on the 15th day of May, eight days after Dodge had had the sec'ond shock of paralysis. In that will he increased the plaintiff’s' legacy to $30,000, and he gave to his executor in trust for his minor son all the residue of his estate, to be held and managed by him until the son reached the age of twenty-five years, when the estate was to be paid over to him; and in case his son died under twenty-five, unmarried, or without lawful issue, then he gave the whole of the estate held by the trustee to his sister and to the plaintiff, to be equally divided between them. There is no reliable evidence that the check was in existence after the date of that will. The increase by that will of her legacy was nearly equal to the whole proceeds of the real estate upon which she held the mortgage. Was not whatever Dodge owed her upon the mortgage or the check adjusted by the provisions of this will? As we must hold, unless we credit the story of the plaintiff that the check disappeared about that time, what more rational inference than that it was upon some consideration, ior for .some purpose, destroyed at that time? If the testator intended that the plaintiff, bound to him by no ties, should have, in addition to the $20,000, a legacy of $30,000, thus depleting his estate to the extent of $50,000, there was an exhibition of generosity quite extraordinary for one who had a son and a sister, the natural objects of his bounty. Besides this, he gave her a contingent interest to the extent of one-half of the large remainder of his estate, so that in the event of the death of his son, she would share in his estate to the extent of more than $100,000.
During the year after the death of the testator, she from time to time asked the defendant for advances upon her legacy—never *559 .a cent, according to his evidence, upon her pretended claim—and, upon her request, large sums were thus advanced to her. Finally, on the 28th day of July, 1887, she and her attorney met the defendant at the office of his attorneys, for the payment of the balance of her legacy, and then the amount of payments which had been made to her was ascertained, and the balance of nearly :$23,000 was paid to her, and it is very certain that no mention whatever was then made of this claim.
[f, therefore, this case ' was to be disposed of upon the undisputed facts to which we have referred, and upon the evidence of the plaintiff and defendant, there is absolutely no reason to doubt that the conclusion of the referee was fully justified.
But it is claimed on behalf of the plaintiff that there was some evidence upon the trial of the case from other witnesses strengthening her case, and to that evidence we will now give some attention.'
Mrs. Chertizza testified that she called upon Mr. Dodge a •couple of months before liis death to borrow some money to pay a mortgage upon her house, which was then in process of foreclosure, and that he said he could not loan her the money because he had to pay the plaintiff’s mortgage. It is not improbable that this was said by him as an excuse for not letting her have the money. But if he said it and meant what he said, did he not pay the plaintiff, as she subsequently certified in the satisfaction piece executed by her that he did ?
Mrs. Halstead testified that a few weeks prior to the death of Mr. Dodge, in the first or second week of May, she saw a check lying on a bureau in the plaintiff’s house ; that she read it; that it was for $20,000, drawn on Clark, Dodge & Co., and payable to her, and that it was signed with his genuine signature. This •evidence simply shows what the referee found, that there was such a check in existence about that time.
Mr. Abaurer, a barber, testified that he had a talk with Mr. Dodge six months before his death, about the sale of his Henry street house, and that he told him that there was a mortgage on it for $20,000 to the plaintiff; that after the sale of the house he had another conversation with him, in which he said he had canceled the mortgage and given the plaintiff the check. The evidence of this witness was somewhat confused, and his statement about the check was’ drawn out by plaintiff’s counsel only after the form of his questions had drawn his mind to what he wanted. He had previously stated twice that Mr. Dodge’s language in that conversation was that he had “gone to work and had given Mrs. Miner the $20,000 mortgage,” and then the testimony about the check came out in this way: “I ask you if anything was said on that occasion about a check? A. Yes, sir. Please state what was said on the subject of the check on that occasion? A. Well, he said he went to work and gave Mrs. Miner the check.” The witness stated that he had not talked about the conversation until the time of the prior trial of this case, which was about four years afterward. This was a casual conversa *560 tion about a matter in which he had no interest. Such evidence of distinct conversations has always been regarded as the most unsatisfactory and unreliable evidence. The precise words used by the testator may have been misunderstood or misremembered. But even if the evidence of this witness be taken to be accurate’ as he gave it, it proves only that the check was in existence early in May, and about that there is now no dispute.
Mrs. Dye testified that after the death of Mr. Dodge she was at the plaintiff’s house; that the defendant came there, and she saw the plaintiff come through the room where she was sitting and pass to the door opening into a hall, with some papers in her hand, and heard her say to the defendant, who was standing outside, “ those were the papers Mr. Dodge told her to give to him.” The counsel for the plaintiff then put this question, “Will you state whether or not anything was said about a check on that occasion ?” Then the witness answered that she handed the defendant the papers “ and remarked at the same time, that is the check that Mr. Dodge had told her to give to Mr. Wheeler.” That something was then said about a check is not inconsistent with the evidence of the defendant. He testified that in July, after the death of Mr. Dodge, thecplaintiff brought to him, in her house, two checks written by Mr. Dodge with alead pencil, one for $5,000’ and another for $10,000, drawn to the order of the plaintiff on Clark, Dodge & Co., and she handed them to him and he then said to her, “these are two papers which Mr. Dodge spoke to me about at the time he stated to me that he had made me sole executor, striking out Mr. Clark as co-executor, and he said: ‘ I have drawn my will in my own handwriting. It has not yet been witnessed, but I have drawn two memorandum notes or checks, showing that I desire to leave Mrs. Miner the sum of $30,000. The old will called for $15,000, the new will $30,000 as her legacy, and upon the completion of the new will I shall destroy the old willthen I said to Mrs. Miner, ‘You see that these two sums of $15,000, stated in these two papers, added to the sum of $15,000 in the original will, shows that Mr. Dodge has carried out that which he said to me he desired to do. They have no value.’ To this Mrs. Miner said: ‘ I understand that perfectly.’ ” It is quite-true that this evidence of the defendant is denied by the plaintiff. For reasons we have already given, we think the evidence of the-defendant entitled to the most credit, and it is entirely inconsistent with the whole theory of the plaintiff’s case. It may well be that the occasion of the delivery of these two checks was the occasion referred to by Mrs. Dye, who testified that she did not hear what the defendant said at that time.
Mrs. Eorlence, who was in the plaintiff’s service in some capacity, testified that in October, after the death of Mr. Dodge, she heard the plaintiff ask the defendant “ to please pay that $20,000 check,” she being in one room and they in another. She admitted that, although she was a witness upon the first trial of the case, she did not testify to anything about this check. During the summer and fall of 1886 the defendant did give the plaintiff, upon her request, several checks for money used by her in repair *561 ing her house, and for her expenses, and the money so advanced was to apply, and afterward was applied, upon her legacy, and this witness testified that she heard those checks mentioned many times. She gave her evidence about six years after the occasion mentioned by her, and even if it had not been contradicted by the defendant, the referee could well hesitate to place much reliance upon it.
We have now called attention to all the evidence which tends to support the plaintiff as to any questions now in dispute between the parties. The referees had the great advantage of seeing and bearing the witnesses, and were thus more competent to judge of their credibility than judges sitting in review. Here the plaintiff is upon one side confirmed to some extent by other witnesses, and the defendant is upon the other side confirmed to some extent by other witnesses and by undisputed facts and the inferences from them. Two referees, hearing and seeing the witnesses, have sustained the position of the defendant, and while there is more or less mystery and doubt still surrounding the mortgage and the check, we think the balance of the probabilities is that if they ever had any real foundation as securities for money to be paid, they were discharged in some way in the lifetime of Mr. Dodge, and that they were never meant to co-exist with the legacy-given to her in his will.
Public policy requires that claims against the estates of dead men should be established by very satisfactory evidence, and the courts should see to it that such estates are fairly protected against •unfounded and rapacious raids.
Our conclusion is that the judgment of the general term should be reversed, and that entered upon the report of the referee should be affirmed, with the costs in this court and the courts below.
All concur, except Andrews, Oh. J., not sitting.