(94 App. Div. 342.)

### ROBERGE v. BONNER et al.

(Supreme Court, Appellate Division, First Department. May 13. 1904.)

1. APPEAL—HARMLESS ERROR—UNDISPUTED ISSUES.

   Where the making of a contract was the one substantial dispute on the trial, and the verdict rendered did substantial justice between the parties, and no material error was committed relating to the particular issue in dispute, the appellate court will not reverse the judgment because of errors affecting other issues.

2. EVIDENCE—ADMISSIONS—PROBATIVE FORCE.

   Verbal admissions uncorroborated by other facts or evidence should always be received with great caution, and admissions, made in the course of a casual conversation, after a great lapse of time are of little probative force.

3. CONTRACTS WITH DECEASED PERSONS—EVIDENCE—ESTABLISHMENT.

   Contracts claimed to have been made by deceased persons to be enforced after death are to be regarded with grave suspicion, and the testimony upon which they are sought to be sustained closely scrutinized; and claims thereunder should be allowed only when established by strong and convincing evidence.

4. SAME—EVIDENCE—SUFFICIENCY.

   Evidence, consisting largely of conversations had years before, *held* insufficient to establish a contract by which defendant's decedent agreed to assure to plaintiff the sum of $100,000 upon his (decedent's) death.

5. SAME—EVIDENCE—ENTRIES IN BOOKS—RELEVANCY.

   Entries made by decedent in a book as to opinions expressed by plaintiff as to the proper treatment of horses, while competent to show that decedent had employed plaintiff, had there been any dispute about that matter, were irrelevant to the issue as to whether decedent had agreed to give plaintiff a sum of money in consideration of services on his (decedent's) death.

6. SAME.

   Conversations with executors, and a communication sent by plaintiff to them in relation to a claim against the estate, are irrelevant to the question as to whether the executor's decedent made a certain contract with plaintiff.

   Van Brunt, P. J., and Hatch, J., dissenting.

Appeal from Trial Term, New York County.

Action by Franklin P. Roberge against Robert E. Bonner and others as executors and executrix of the will of Robert Bonner, deceased. From a judgment for defendants, and from an order denying a new trial, plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

Rastus S. Ransom, for appellant.
William N. Cohen, for respondents.

INGRAHAM, J. The plaintiff asks for a judgment for $100,000 against the estate of Robert Bonner, deceased, upon an alleged agreement by which Robert Bonner agreed to assure to the plaintiff that sum upon his death. The question whether or not such a contract was made was submitted to the jury, who found a verdict for the defendant; and this appeal is based upon errors committed at the trial, mainly those in relation to the admission of evidence. The substantial question submitted to the jury was whether or not the contract or agreement sued on was ever made; and, the jury having found upon that issue in favor of the defendant, it would be manifestly unjust to reverse the judgment unless there were errors of a substantial character which affected that issue, as that was the only issue about which there was any substantial dispute. The witnesses for the plaintiff, as well as those for the defendant, testified that the plaintiff had rendered services to Mr. Bonner from the time it is alleged this contract was made to the time of his death, and that Mr. Bonner constantly consulted with him about his horses; and it is evident that if a valid contract, such as is alleged in the complaint, had been made, the plaintiff would have been entitled to the direction of a verdict in his favor. The making of the contract was the one substantial dispute upon the trial, which has been resolved in favor of the defendant, and if that verdict did substantial justice between the parties, and there was no material error committed which had relation to that particular issue, an appellate court is not required, in the administration of justice, to reverse the judgment because of errors which affected other issues which were not in substantial dispute.

There was no question as to the value of the plaintiff's services. The cause of action, as alleged in the complaint, is that between the 15th day of May, 1876, or thereabouts, and the 6th day of July, 1899, the plaintiff rendered services to said Robert Bonner, at his request, as a veterinary surgeon, and provided and administered divers medicines and furnished other material in that behalf for said Robert Bonner, at his request; that the said work, labor, and services were performed and medicines and materials were furnished by the plaintiff for said Robert Bonner upon the express oral agreement, entered into by and between the plaintiff and Bonner at the city of New York on or about the 15th day of May, 1876, whereby said services should be done and performed by plaintiff during the lifetime of said Robert Bonner, and said Robert Bonner, in consideration thereof, and instead and in lieu of making payments for same as they were rendered, or periodically, promised to pay to the plaintiff the aggregate sum of $100,000 before his death, or

to provide for the payment of said sum to the plaintiff by his last will and testament.

Of the many attempts that have been made to recover by an action at law because of disappointed expectations as to the disposition of a dead man's property, this is the first case, to my knowledge, in which it has been alleged that a person in the full possession of his faculties and in middle life has agreed to pay such a sum of money to an entire stranger, not connected with him by blood, for services to be rendered; and from the very nature of the contract alleged and the nature of the proof to support it, to which attention will be called, the claim itself must be looked upon as one most unusual and improbable. The contract is alleged to have been made on the 15th day of May, 1876. Mr. Bonner, a man of large wealth and important business interests, lived until 1899—over 23 years. It is not alleged that during all that time any claim of any character or description was made against him, based upon this contract. It is conceded that during all that period he had employed the plaintiff to shoe his horses, both in New York and at his country place; that during this period of 23 years the plaintiff furnished monthly bills for the services that he rendered to Mr. Bonner, which bills were always promptly paid upon presentation. There is evidence that, in addition to receiving payment of the monthly bills from Mr. Bonner, the plaintiff borrowed money of Mr. Bonner, which was repaid, without a claim of any kind, so far as appears, that Mr. Bonner was indebted to the plaintiff in any amount except what had been promptly paid upon a presentation of the bills therefor. The evidence to sustain this contract consists entirely of alleged declarations made by Mr. Bonner to four individuals, in no way connected with him, but who are all connected with the plaintiff; two being horseshoers who had been in the employ of the plaintiff, one being the plaintiff's brother, who was also a horseshoer, and the fourth a person who had been employed by the plaintiff at various times. So far as appears, no member of Mr. Bonner's family, and no friend or acquaintance, had ever heard of such an agreement. These alleged admissions of Mr. Bonner were made over 18 years after the contract was alleged to have been made. Thus, so far as appears, for over 18 years Mr. Bonner was under an obligation to pay $100,000 to the plaintiff without any communication of that fact to any one. The evidence is undisputed that Mr. Bonner was much attached to horses, having purchased and owned some of the fastest and most valuable horses in the country. He was careful in his business affairs, always paying his bills promptly, and he had had a large experience with horses, considered himself qualified to treat them himself, always attended and gave instructions about them, and insisted upon having his views carried out. The plaintiff's father came to this country in the year 1869, and in the spring of 1870 he opened a horseshoeing establishment in the city of New York. It appeared that he had made a particular study of horses' feet, and had written a book on that subject; and after he came here Mr. Bonner employed him to shoe his horses, and subsequently it would appear that they consulted together about horses and the proper method of shoeing them. This relation continued for several years. In 1876 the plaintiff's father had an establishment in Thirtieth street, and the plaintiff, then about 21 years

of age, had opened a horseshoeing establishment of his own, and had commenced to attend a veterinary college, from which he graduated in 1880. In the fall of 1875, it appears that Mr. Bonner had employed the plaintiff to do some horseshoeing, and the plaintiff continued to do work of this kind for Mr. Bonner until his death, in 1899.

Before calling attention to the testimony by which it is sought to prove this contract, there are two principles which it is well for us to bear in mind in considering the weight to be given to this testimony. The first is that verbal admissions, uncorroborated by other facts or evidence, should always be weighed with great caution, and that admissions, made in the course of a casual conversation, after a great lapse of time should be given little probative force. 1 Am. & Eng. Enc. of Law (2d Ed.) p. 723. The second is that contracts claimed to have been made by deceased persons, to be enforced after death, are to be regarded with grave suspicion, and the testimony upon which they are sought to be sustained closely scrutinized, and the claim should only be allowed when established by strong and convincing evidence. Shakespeare v. Markham, 72 N. Y. 400.

In Hamlin v. Stevens, 177 N. Y. 47, 69 N. E. 120, it is said:

"Contracts of the character in question have become so frequent in recent years as to cause alarm, and the courts have grown conservative as to the nature of the evidence required to establish them, and in enforcing them, when established, by specific performance. Such contracts are easily fabricated and hard to disprove, because the sole contracting party on one side is always dead when the question arises. They are the natural resort of unscrupulous persons who wish to despoil the estates of decedents."

We have in this case a contract alleged to have been made 23 years before the decedent's death, by which for indefinite services to be rendered in the future as a veterinary surgeon by a young man 21 years of age, who had just commenced to study that profession, there was an absolute promise to pay $100,000—a contract which requires strong and convincing evidence to sustain it, where the only evidence of it is testimony of casual conversations with the decedent, made many years after the contract is alleged to have been made, and under circumstances which at least render the accuracy of the testimony as to the conversation extremely doubtful. Can a contract which must be proved by strong and convincing evidence be said to be proved by testimony of such improbable admissions?

The first witness who was called to prove this contract testified that he first made the acquaintance of Mr. Bonner about the year 1882, in the horseshoeing establishment of the plaintiff's father; that thereafter he knew Mr. Bonner so as to shake hands with him and pass the time of day; that he saw Mr. Bonner generally about a dozen times altogether, watching his horses being shod; that he also met Mr. Bonner 10 or 15 times at horse sales, the particular ones he could not recollect; that the last horse sale he attended at which he saw Mr. Bonner was in 1894, at the Madison Square Garden, and on that occasion he had a conversation with him about the plaintiff. This conversation was 18 years after the alleged contract was made, and 9 years before the witness testified, and he had never spoken to any one about the conversation until a few months before he gave testimony. He testified: That when he was in the Garden he saw the plaintiff examining a horse, and that

he stood about 20 feet from the horse with Mr. Bonner. That they were talking on casual things, and Mr. Bonner asked the witness if he had ever heard that the plaintiff had saved his life—Mr. Bonner saying that at the farm, in Tarrytown, they were shoeing a horse, and, in taking down a shoe from the wall where it was hanging, this shoe caught in the horse's tail, and Mr. Bonner, being in the corner where the shoeing was, could not get out of danger; that the horse kicked back twice, and the second time knocked his hat off, and the plaintiff, seeing Mr. Bonner in a dangerous position, jumped in and grabbed the horse's tail to give Mr. Bonner a chance to get out of danger; that, after he got out of this corner, he felt sure that Mr. Roberge was positively killed, the way the horse kicked. "So Mr. Bonner told me that he appreciated Mr. Roberge's services in saving his life so much that he told Frank, he says, 'Now, Frank, what would you rather do—have me pay you for my city work, or would you rather take a hundred thousand dollars when I die?' And Mr. Roberge told him that he would rather take the one hundred thousand dollars, and Mr. Bonner told me that he told Mr. Roberge that, if he would stay in his service as long as he lived, when he died he would leave him one hundred thousand dollars, and he would leave it so that there would be no litigation in the matter at all." Upon cross-examination the witness placed this conversation with Bonner in 1891, having said in his direct that it was in 1894; that he first met Mr. Bonner in 1882, having said on his direct that it was in 1888; that about seven or eight years before the trial, after the conversation, he had had a stroke of paralysis, and that he never had any conversation with Mr. Bonner at any other time, except, as he characterized it, "to pass the time of day"; that between November, 1894, and two months before the trial, he had never spoken to any one about the conversation; that he could not recall anything else that happened in the year 1894. The contract was that the plaintiff was to do Mr. Bonner's city work, for which the plaintiff was to receive $100,000 upon Mr. Bonner's death. The city work, as specified by this witness, was not confined to veterinary work, but would include horseshoeing and all other work of the kind that the plaintiff did for Mr. Bonner. Yet the evidence is undisputed that, for all the horseshoeing work that the plaintiff did for Mr. Bonner from the time of this alleged contract to the time of his death, the plaintiff rendered his monthly bills, which were promptly paid. Here is a mere casual conversation at a horse sale with a man with whom Bonner had never conversed before, and we are asked to believe that Mr. Bonner volunteered to the witness the details of a contract involving $100,000 that he had made 18 years before.

The second witness called by the plaintiff was the plaintiff's brother, who was also a horseshoer and had been in the plaintiff's employ. He testified: That on February 22 or 23, 1895, he had a conversation with Mr. Bonner at his horseshoeing establishment in Thirtieth street. That he told Mr. Bonner that his brother's business had suffered because of his attention to Mr. Bonner, to which Mr. Bonner replied that the plaintiff had done him a favor years ago through saving his life, and that he said that "he made an agreement with him to pay one hundred thousand dollars at his death. He asked my brother if he wished to be paid monthly, or whether he would rather have it in bulk, and my brother

told him that he would rather have it in bulk, so that he told him to continue doing his work as veterinary, and when he died there would never be any trouble; one hundred thousand dollars would be left to him." That Mr. Bonner spoke about the plaintiff saving his life. That it was about 25 or 27 years before. Upon cross-examination he stated that Mr. Bonner said, "never mind how my brother had been injured taking care of him or shoeing him; that he had an agreement with my brother some twenty odd years previous that he was to pay him $100,000 at his death. He asked him whether he would rather have the money in a lump or whether have it monthly, and my brother chose in a lump, and he says, 'There will never be any question about it.'"

The next witness was a horseshoer, unemployed at the time of the trial. He testified: That he had known the plaintiff for 15 or 16 years when he went in his employ. That in November, 1898, he was sent to Mr. Bonner's stable to take off some horses' shoes. That as he was removing the shoes in the stable he saw Mr. Bonner, who told the witness to come to the house, as he would show him a shoe as a model for one he wished made. That, when he went upstairs with Mr. Bonner, Mr. Bonner asked him how long he had been working for the plaintiff, to which the witness replied, "Twelve or thirteen years." That Mr. Bonner then said: "Well, I know him about thirty years—since he has been a boy. About twenty years ago he saved my life, and I then asked him whether he preferred to be paid a monthly payment for his city services, or would he rather have it left in bulk, and he said he expected to take it in a bulk, and I agreed to pay him it and provide for him." That Mr. Bonner continued, "If you guess in a week, you could not guess the amount." Here, again, the statement that Mr. Bonner made was that he had agreed to pay the plaintiff for "his city services," or that he was to have it in a bulk, and that the plaintiff said he would take it in a bulk. But the plaintiff's city services would certainly include horseshoeing, for which he was paid monthly.

The next witness was a horseshoer in the employ of the plaintiff, and as plaintiff's employé he had done work for Mr. Bonner. He testified: That he remembered having a conversation with Mr. Bonner about May, 1898, at the plaintiff's office. That the witness was shoeing a horse at that time for Mr. Bonner, when Mr. Bonner asked the witness how long he had known the plaintiff. That the witness said, "Seventeen or eighteen years," when Mr. Bonner replied: "'I know the doctor over thirty years, when he was a boy. The doctor saved my life at one time, and to compensate him for his services, to show my appreciation, I asked the doctor how he would like to be compensated for his services in the city stable—his veterinary services. Would he like me to pay him monthly, or leave him a lump sum, provided he stayed with me always? And the doctor accepted that, and he said he preferred to take the one hundred thousand dollars.' And Mr. Bonner said, 'The doctor will be a lucky man for saving my life.'" This is the only witness that injects into the statement by Mr. Bonner that the services to be performed by the plaintiff were veterinary services for which he was to be paid $100,000, and the testimony of these admissions of Mr. Bonner is the only testimony in the case that has the slightest tendency to prove that any such contract as alleged in the complaint was made.

Leaving out of view the improbability of the whole story of Mr. Bon-

ner's having any such conversation as is detailed with any of the witnesses, it will be seen how a very slight change in the words used would make a statement of an intention to do something for the plaintiff, or to make some provision for him by will, an admission of a contract. I think that these conversations, assuming them to have been correctly reported, are too indefinite and uncertain to base a finding that any contract such as is alleged in the complaint was made; and, if we assume that these witnesses detailed what they remembered of casual conversations of this kind which had taken place years before, the recollection of such conversations must be so uncertain that the court would not be justified in sustaining a verdict based solely upon them. If such a contract had been made, it is certain that the plaintiff could not have been mistaken as to its character or his rights under it, and that, when he discovered that no provision for him had been made by Mr. Bonner in his will, he would at once have presented a claim based on the contract. It is important, therefore, to consider plaintiff's proceeding immediately after Mr. Bonner's death, to see if it is consistent with the execution of such a contract.

Mr. Bonner died in July, 1899. In August, 1899, the plaintiff consulted with his attorney about his claim against his estate, and it must be assumed that he stated to the attorney the facts in regard to his relations with Mr. Bonner. On the 19th of December, 1901, nearly 2½ years after he had first consulted his attorney, he sent to the executors of the estate of Mr. Bonner a bill for professional services rendered "to the late Robert Bonner, at city stable, including consultation and advice at house evenings, also professional services rendered at auction sales, horse shows, and other stables," for 23 years, at $3,000 per year, $69,000. To this bill was attached the following note: "Providing I receive a check for $25,000 within one month from date, I will receipt the above claim in full." When this claim was rejected by the two executors, he sent a copy of it to Mr. Bonner's daughter, who was executrix, with a letter dated December 26, 1901, which he closed as follows: "If a party's services for 25 years is not worthy of compensation, there is no justice." This claim was rejected in December, 1901, and on the 19th day of June, six months afterwards, the plaintiff commenced this action. He makes no explanation of this bill, except that he had sent an informal claim to the executors for $100,000 prior to sending this bill. This claim upon the estate for $3,000 per year for 23 years for services rendered Mr. Bonner is inconsistent with the existence of the contract as alleged in the complaint. The plaintiff, when he submitted this claim (and the claim was submitted after he had retained a lawyer to advise him in relation to it), could have had no understanding that there was an express promise to pay him $100,000. It seems to me that no verdict of a jury founded upon such evidence, contradicted as it is by this claim for services based upon an obligation to pay $3,000 per year, would for the moment be permitted to stand. The court left it to the jury to say whether or not any contract at all was made between the plaintiff and the deceased, Mr. Bonner, because, if there was no contract, they need not go further, "that will end the case, and your verdict must be for the defendants." The jury found a verdict for the defendants.

Entertaining the view that I have expressed in relation to the proof of the plaintiff in this case, unless there was a material error in the ruling upon evidence or in the charge to the jury which related to the making of the contract, it seems to me that it would be improper to reverse the judgment. The plaintiff relies upon many exceptions which are scattered through this record to rulings upon questions of evidence. The most important seem to be the refusal of the court to admit certain entries made by Mr. Bonner in a small notebook in relation to the plaintiff. It seems that Mr. Bonner was in the habit of keeping a notebook in which he entered incidents in relation to his horses and their treatment. Scattered through these notebooks there are entries made by Mr. Bonner relating to opinions expressed by the plaintiff as to the proper treatment of horses, principally in relation to their feet or the method of shoeing, sometimes agreeing with the plaintiff and sometimes disagreeing with him. If there had been any question presented upon this trial as to whether or not the plaintiff performed the services required of him by Mr. Bonner, these entries would have been material. The evidence was undisputed that Mr. Bonner had employed the plaintiff for 23 years prior to his death; that during that time Mr. Bonner was in the habit of sending for the plaintiff and consulting with him about his horses; that he would send for him to go to his farm at Tarrytown to attend to his horses; and that he was constantly engaged in doing work for Mr. Bonner. There is no evidence that the plaintiff ever refused to do anything that Mr. Bonner asked him to do, nor is there any such defense set up in the answer or insisted upon at the trial. If such a contract as is alleged in the complaint had been made; and Mr. Bonner had become obligated to pay to the plaintiff $100,000 at his death, in consideration of the plaintiff's promise to do such veterinary work as Bonner requested during his life, there would be no question upon this record but that the plaintiff would be entitled to recover. Assuming that the entries in this book were competent evidence, if they had related to any subject about which there was a contest upon the trial, they were all entirely irrelevant upon the question as to whether or not a contract was made; and as that was the substantial question presented, and upon that issue the plaintiff has failed to sustain the allegations of the complaint by sufficient evidence, I do not think we are called upon to reverse the judgment.

The plaintiff also endeavored to prove conversations with the executors of the estate prior to the bringing of the action, and offered in evidence a long communication which he had sent to the executors in relation to his claim, objections to both of which the court sustained. This evidence could have had no bearing upon the main question at issue, namely, whether or not a contract was made. The plaintiff was allowed to testify that he had made a claim for $100,000 upon the estate prior to the presentation of his claim for $69,000, and that fact was all that was essential. None of the other exceptions require consideration, in view of the opinion that we have expressed as to the probative force of the plaintiff's evidence. The jury having determined this question of fact in favor of the defendants, we are not justified in setting aside the verdict.

It follows that the judgment and order appealed from are affirmed, with costs. All concur, except VAN BRUNT, P. J., and HATCH, J., who dissent.

HATCH, J.  I dissent from the prevailing opinion in this case, for the reason that upon the evidence a case was presented as to the existence of the contract which required its submission to the jury.  Upon such question the entries made by Mr. Bonner in his memorandum book were competent evidence and bore upon the vital questions in the case.  The exclusion of such evidence, therefore, constitutes reversible error.

We are not now concerned with the question as to whether a recovery by the plaintiff can be sustained upon the evidence received and that which was improperly excluded.  It will be time enough to consider such question after a verdict has been rendered in plaintiff's favor, if that event ever happens.

I therefore think that the judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event.