right to an account from the surviving partners and to a payment of such sums as should appear due to the estate upon such account. The expenses of litigating that account might have been imposed upon the estate in part, but this was not done. Moreover, the judgment provided for the full payment to the executors of $31,000. Had the decretal purpose been to make the estate pay any part of the costs, a sane and ordinary form of judgment would have provided for the payment of the sum named, less the designated portion of the costs. The judgment is best understood in the light of the provision that if the $31,000 be not paid the partnership real estate shall be sold and its proceeds devoted to paying not only the $31,000, but the costs awarded by the judgment. A judgment which imposed the costs wholly upon the surviving partners in the case of a sale must have intended the same imposition if the sale did not become necessary.

Let decree be presented accordingly.

Decreed accordingly.

---

(62 Misc. Rep. 173.)

### In re SERGANT'S ESTATE.

(Surrogate's Court, Oneida County.   January, 1909.)

1. EXECUTORS AND ADMINISTRATORS (§ 506*)—SETTLEMENT—SURCHARGING EXECUTRIX—EVIDENCE.

   In the matter of the settlement of an estate, evidence of certain of the heirs as to transactions which would increase the amount of the estate and surcharge the executrix *held* so improbable and inconsistent as to compel finding for the executrix.

   [Ed. Note.—For other cases, see Executors and Administrators, Dec. Dig. § 506.*]

2. EXECUTORS AND ADMINISTRATORS (§ 475*)—SETTLEMENT OF ACCOUNTS.

   On the settlement of the accounts of an executrix, proceeds of real estate of testator not sold by her as executrix should not be charged against her.

   [Ed. Note.—For other cases, see Executors and Administrators, Dec. Dig. § 475.*]

In the matter of the judicial settlement of the estate of Charles Sergant, deceased.   Decree rendered.

Brown & Brown (Charles D. Thomas, of counsel), for petitioner.

J. W. Watts, personally and for administratrix Utter.

Henry F. & James Coupe, for contestant Beal.

SEXTON, S.   Charles Sergant died at Bridgewater, N. Y., January 23, 1892, and left a will, dated June 11, 1884, which was duly admitted to probate June 6, 1892, and letters testamentary were issued to Ann Maria Beal.   An inventory was filed August 2, 1892, showing an estate of $3,902.66.   July 20, 1893, an account was filed, showing a balance in her hands for distribution of $3,249.93.   July 23, 1903, a decree settling and adjusting said account was left at the surrogate's office, and is now with the papers on file, which, though complete, was not signed by the surrogate.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The will of Charles Sergant provided:

"After all my lawful debts are paid and discharged, I give, devise and bequeath to Ann Maria Beal, wife of my friend, John Beal, of Bridgewater aforesaid, all my property both real and personal, of which I die possessed, to be hers during her lifetime, and after her death, the avails of my property, of which she has the use and income during her life time, is to be divided equally among her surviving children."

Said Ann Maria Beal died May 30, 1907, leaving William J. Beal, Charles M. Beal, and M. Cornelia Utter, her surviving children. William J. Beal was a subscribing witness to the Sergant will, and was used to prove it. On June 24, 1907, said Charles M. Beal, and his sister, M. Cornelia Utter, were duly appointed administrators with the will annexed of the Sergant estate, and filed separate bonds. Ann Maria Beal, executrix of the Sergant estate, left a will, which was probated June 24, 1907. Letters testamentary were issued to William J. Beal. October 2, 1907, William J. Beal, as executor of the Beal estate, filed his account of the proceedings of Ann Maria Beal in the Sergant estate, showing a balance of $3,221.31. October 24, 1907, objections were filed to said account by said Charles M. Beal, alleging that the account in the Sergant estate should be surcharged with $1,750, the amount of a note, dated April 1, 1888, payable to Charles Sergant, or bearer, with use, and signed by the contestant, and claimed to have been fully paid by him to Ann Maria Beal as executrix of the Sergant estate; that said Sergant estate should also be charged with $385, alleged proceeds of some land, belonging to the Sergant estate, conveyed by Ann Maria Beal to the Unadilla Valley Railway Company, by deed dated October 15, 1892. All of the evidence given upon the trial was confined to these items.

The contention of the contestant is that he April 1, 1888, borrowed $1,750 from Charles Sergant, and gave him his note therefor, and after his death the contestant paid Ann Maria Beal, executrix of the Sergant estate, all interest on said note, and April 1, 1895, $1,855, in full of principal and interest, and took the note into his possession; that the Sergant estate should now account for the principal of said note, $1,750. The estate contends that the face of said note, with the four indorsements thereon, all in the handwriting of contestant, is a fabrication, and never was in the possession of Charles Sergant or his executrix, Ann Maria Beal. As to the $385, the expressed consideration in said deed, the estate contends that this court has no jurisdiction to determine that item.

The history of the note as given by the contestant, his wife and son, is substantially that it was written by Charles M. Beal April 1, 1888 (Easter Sunday), at his home in Bridgewater, on a piece of paper taken from an account book, and with a gold pen used by him when a boy in school. The ink used was taken from a small, wooden, pocket inkwell, with screw cap and small glass bottle inside, into which no ink had been put prior to April 1, 1888, since he left school at the age of 19 years, a period of 13 years and about 31 years ago. The note was then delivered to Sergant, and contestant received from him in cash $1,750. It was not put in any bank. Sergant took the note, folded it, and put it in his pocket. April 1, 1892, the contestant paid his

mother, Ann Maria Beal, $420, back interest, and paid it each year till April 1, 1895, when he paid her $1,855 at her house, in full of principal and interest, and took up the note, returned home, and delivered it to his wife. The note then bore all the evidences of hard usage and creases, and was in substantially the same condition as to folds and creases, and in the same shape and condition as when produced upon the trial in court. The wife kept it until the trial.

The following words and figures appear upon the back of the note, to wit:

"April First, 1892, Received on the with note Int four Hundred and Twenty dollars, $420.00."

"1893, April first I Received on the with in note In one Hundred and five dollars, $105.00."

"1894, April first I Received on the within note one Hundred and five dollars, $105.00."

"1895, April 1, I Received on the with in note In full payment Eighteen Hund and fifty five dollars, $1855.00."

They were made at the time of their dates by the contestant, with the identical pen and ink used in drawing the note. The inkwell had never been filled or ink changed in any manner between the time contestant left school and the last indorsement, April 1, 1895, a period of 20 years. The note shows evidence of being folded from end to end a number of times. When contestant received the note, and before he tore his name off, it had on it the creases from folds. On April 1, 1895, the contestant took from his house $1,855, and with his son, Adelbert, who was going to school, drove to his mother's house in the village of Bridgewater, where Adelbert left the wagon and went to school. The contestant showed his son a large roll of money on that morning. The money to pay the note was made up of $1,000, obtained from Jones & Townsend in cash, and from a sand bank in the cellar, and a teapot in the house of contestant, and some was furnished by Sarah J. Beal. A portion of the money came from baling hay and an auction sale held in 1894. Adelbert, the son, frequently took dinner with his grandmother in 1895, and during the month of March or April of that year she told him several times she wanted him to tell his father that she wanted some money on the Sergant note, or all of it, and he told his father each time. She showed Adelbert the note. He testified it looked very much like Exhibit 2. "It was a piece of pad paper." Adelbert and his father were at Ann Maria Beal's April 1, 1895, in the morning. Adelbert took dinner with Mrs. Beal that day, and she told him in substance that she had straightened all up with his father on the Charles Sergant note, and that things were square. This was at about "quarter to 1 o'clock" in March or April. Two or three days thereafter Adelbert next saw said note in his father's possession.

We will first consider the $1,750 note, of which the following is a copy:

"Bridgewater April first 1 1888 For value received I promise to pay Charles Sergant or bearer one year from date $1750.00 Seventeen Hundred and fifty dollars with use.        Ch."

In support of the note is the evidence of contestant, his wife, Sarah J. Beal, and son, Adelbert. Contestant is 52, his wife, 50, and son, 25 years old. It is claimed by the contestant that he paid the note in full, with interest, April 1, 1895, at which time his son, who testified to that payment, was 12 years old.

Is the note, Exhibit 2, the offspring of honesty, or was it conceived in avarice, born of fraud, and nourished by perjury? It was made on Easter Sunday, notwithstanding the general belief among farmers that such notes are void. The contestant testified that he received from Sergant $1,750 in cash. It was not put in a bank, nor does it appear why it was borrowed. During Sergant's life no interest was paid. Sergant collected his interest when due. The inventory shows two mortgages on which there was no past-due interest at Sergant's death. Exhibit 2 is not mentioned in the inventory of the Sergant estate, yet it was then more than four years old. There is no claim that any other personal property was omitted from the inventory. The note was seven years old when contestant and others of his family say it was paid to his mother. William J. Beal, his wife Kittie, and Sergant, lived with Ann Maria Beal for many years, the said Sergant all his life. Still on the evidence at the time of Sergant's death none of these persons knew of the existence of Exhibit 2, unless possibly Sergant. There was no trouble in finding all of the Sergant securities, and other papers. Why then should this note have escaped the appraisers? Sergant's object in giving the life use of all of his property to his friend Ann Maria Beal was to provide her with an income for her life. Why should he withhold from her, or mislay, Exhibit 2, and thereby deprive her of an annual income of $105, and at the same time so leave the two mortgages and the bank certificate of deposit as to be readily found? If Exhibit 2 was found among Sergant's effects, what motive could Ann Maria Beal have in withholding it from the inventory, as she could only use the interest of the same? If she did withhold it, or knew of its existence, her affidavit to the inventory was willfully false, as was also her affidavit to her account, filed July 20, 1893, because on that date, on the evidence of the contestant, $420 interest had been paid to her on the Sergant note, April 1, 1892, and $105, April 1, 1893.

On June 15, 1892, two months and a half after she had received $420 interest on Exhibit 2, according to contestant's testimony, she verified the inventory, using these words:

"That the inventory of the goods, chattels, and credits of said decedent, by this deponent made, and to this deposition annexed, is in all respects just and true; that it is a true statement of all the personal property and effects of said deceased, which have come to the knowledge of this deponent," etc.

The following year, June 20, 1893, after on contestant's evidence she had been paid another year's interest of $105, she says in Schedule B of her account:

"There has been no other asset which has come to the hands of the executor since taking said inventory, except the sum of $168, accrued interest on said bonds and mortgages mentioned in Schedule A, and set forth in the inventory."

In her verification of said account, the following language is used:

"The foregoing annexed account contains, according to the best of knowledge and belief, a full and true statement of all receipts and disbursements on account of the estate of said decedent, and also of all moneys and other property belonging to said estate, which have come to her hands, or which have been received by any other person by her order or authority, for her use, and she does not know of any error or omission in said account to the prejudice of any person interested in the estate of said deceased," etc.

If what Ann Maria Beal swore to as aforesaid was true, then what the contestant and his wife and son have testified to is partly false.

Did Charles M. Beal pay his mother, Ann Maria Beal, the face of Exhibit 2, with one year's interest on April 1, 1895, amounting to $1,-855, when he knew that his mother was only entitled to the income of said note during life, and when he also knew that, if he withheld the payment of the principal until his mother's death, he, being one of the residuary legatees under the Sergant will, would be entitled to letters of administration with the will annexed, and could then pay Exhibit 2 into said estate, and be sure to receive his share thereof? He also knew that if he paid it to his mother, and she spent it, and died without leaving sufficient property to repay it, he would lose his share of it. He probably always knew his mother's financial condition. Ann Maria Beal at the time of her death held contestant's note for $1,000 dated March 31, 1892, which she bequeathed to him in her will. If the contestant succeeds in establishing Exhibit 2, he will have $1,000 out of his mother's estate, represented by Exhibit B, one-half of the Sergant estate, and, in addition thereto, one-half of the amount of Exhibit 2, which his mother's estate will be able to pay. As evidence of the good faith and honesty of the contestant, in his effort to surcharge the account of his mother's representatives in the Sergant estate, with the amount of said Exhibit 2, it is proper to consider the fact that M. Cornelia Utter, a sister of contestant, did not join in the contest, though she would be materially benefited under the provisions of the Sergant will should the contest succeed. This lady lives in Utica, was not sworn as a witness, and seemingly is not under the influence of either of her brothers, but knows them both well. Hence her position in regard to the contest, while it does not rise to the dignity of evidence, is still significant. After the death of Ann Maria Beal, May 30, 1907, the contestant applied for letters of administration with the will annexed in the Charles Sergant estate. Letters were issued to contestant and Mrs. Utter, his sister. They each filed separate bonds. If they had joined, one bond of $7,000 would have been sufficient, as the petition of contestant showed an estate of only $3,500. Charles M. Beal alone verified the petition, and it does not appear why Mrs. Utter gave a separate bond.

There is another circumstance which invites attention. The petition verified by contestant contained this provision:

"That the value of the estate of said decedent remaining unadministered will not exceed the sum and amount of $3,500.00."

Said petition was filed June 5, 1907. The inventory in said estate filed in 1892 showed a gross personal estate of $3,902.66. July 20,

1893, an account was filed by contestant's mother in said estate, showing a balance in her hands for distribution of $3,249.93, so that the petition for letters of administration with the will annexed in the Sergant estate, verified by contestant, stated an amount in keeping with the facts shown by the papers on file. That the contestant knew all about the papers and their contents on file in the surrogate's office can be assumed from the following evidence given by him:

"I was over there [surrogate's office] two or three times before I filed my petition. We looked at the papers there on these occasions. I had not made my petition for letters of administration with the will annexed, before I saw the papers."

When he verified his petition, did he have in mind the $1,750 paid into the Sergant estate? He knew that his mother's account on file showed $3,249.93 as per inventory, and was filed in 1893, upon notice to him and without objection. He knew that to said sum must be added $1,750, paid by him thereafter, making a total, in the Sergant estate, to be accounted for and which must come to his hands, as administrator with the will annexed, of $4,999.93.

For the purposes of showing where the truth lies, it may be profitable to analyze the contestant as a witness. Out of 91 questions asked him by his counsel he gave 87 positive answers, and out of 332 questions asked him on cross-examination he gave 126 evasive answers, many of which were, "I don't remember," "I can't say," "I don't recollect," and yet no reason appears why witness should not have been as clear, in regard to the matters inquired about on cross-examination, as those inquired about on direct examination. The contestant's testimony in regard to Exhibit 2 shows a very hazy and uncertain memory, and a mind so vacillating and contradictory that one is forced to inquire whether it is really traveling along an honest highway. He testified: .

"The indorsements on Exhibit 2 were made at the several dates that each of them is dated. I couldn't say whether the several indorsements on the back of Exhibit 2 were made upon the day they bear date. The second indorsement might have been made at my house. I have a distinct recollection where it was made. It was at my mother's. I don't remember whether Sergant folded Exhibit 2. I will swear that I saw him fold it. I wrote all of the indorsements on the back of Exhibit 2 after the paper had been folded. I couldn't say whether the paper was folded at all when I wrote any of those indorsements. I don't know whether Exhibit 2 had been folded before I tore my name off it. When the paper came to me and before I tore the name from its bottom, it had on it these creases from folds."

When questioned as to where he got the $1,855 which he claimed he paid to his mother April 1, 1895, in full of Exhibit 2, he wrested the laurels from the brow of Ananias, in the following reckless manner:

"I got Townsend's check in 1895, before the 1st of April. Mr. Townsend gave me $1,000 at his office. I don't say whether it was cash or check. I will swear that in 1895 William Townsend turned over to me $1,000 in cash. In check or cash—I couldn't tell the amount of the cash or state the amount of the check. I did not take the $1,000 home in a lump. I do not know, it might have come a piece at a time. I took that money in a single lump home. That $1,000 that I took home in a lump was made up of money—bills. I started home with this $1,000 in bills from Townsend's office. I got the $1,000 in

bills from Townsend and Jones. I did not arrange to pay Jones and Townsend in any way. I gave them a note. I had in my house on April 1, 1895, $1,000 that I got from the Nathaniel Kirkland estate. I paid the Jones and Townsend note when I got my $1,000 from the Kirkland estate. I got this money from Jones and Townsend to pay the Sergant note [Exhibit 2]."

The foregoing battle with truth seemed necessary to show where the money came from to pay Exhibit 2 as claimed. Jones & Townsend were contestant's attorneys in the Kirkland estate, and are both now living in Utica. They were not called as witnesses. Nor was the note given to Jones & Townsend by contestant produced, though it was requested, after contestant said he thought it was at his home. Contestant's wife accounts for the balance in these handy words:

"I saw him get the money and count it. He went to his mother's to pay the note. The money was kept in a sand bank in the cellar, in a teapot, and different places. I had part of it. The money was got in different ways. He baled hay, and had an auction sale of stock, and he got from the Kirkland estate $500."

The auction was in 1894. The contestant swore he got $1,000 from the Kirkland estate. His wife says it was $500. The contestant's wife, Sarah J. Beal, was impeached by six neighbors, and more effectually impeached herself by the following testimony:

"I have lived in Bridgewater all my life; 50 years."

On cross-examination she testified:

"Q. You lived for some time in Waterville with a man by the name of Cook? (No answer.) By Mr. Thomas: How long did you live in Waterville? A. Five or six years. Q. Was it five or six years that you lived with some one else? A. I don't remember. Q. You don't remember whether or not you lived at Waterville and passed as the wife of a man by the name of Cook? A. I don't remember that. Q. You won't say that you did, Mrs. Beal? A. I don't remember."

She said she was never married except to Mr. Beal. Such evidence staggers credulity. If she lived with a man in Waterville or went by the name of Cook before she married Mr. Beal, she still remembers it. To say "I don't remember" implies a former knowledge. The answer, "I don't remember," to such questions, is the perjurer's shelter. As the taste of the apple sat upon the tongue of Eve till she entered her tomb, so will the memory of a woman's first illicit conjunction with a man burrow in her brain till its habitation falls to dust.

There is another witness, Adelbert Beal, the son of the contestant, without whose evidence the contest must fail. He is 25 years old, and was only 12 years of age April 1, 1895. This witness was asked to give a conversation he had with his grandmother, Ann Maria Beal, when he was a mere child. He was equal to the demand. He said:

"I went with my father, who showed me a large roll of money, on April 1, 1895, to my grandmother's. It was in the morning. I left father at my grandmother's and went to school, and was recorded late that morning. I took dinner with grandmother that day, and at about a quarter to 1 in March or April she told me she had straightened all up with my father on the Charles Sergant note, and that things were square. Grandmother had showed me the note before. It was a piece of pad paper."

There is no doubt but that Exhibit 2 is a leaf out of a book. It is yellow and ruled crosswise with blue lines and lengthwise with red

lines. It is about 12½ inches long and 5¼ inches wide, and, when produced in court, was folded so that it was 5¼ inches long and 1¼ inches wide. It was thus folded when Beal gave it to his wife April 1, 1895, who put it away and took care of it till the trial. The boy said he afterwards saw the note his grandmother showed him, which was on a piece of pad paper, in his father's possession. This witness on cross-examination, when pressed as to his connection with breaking into the Bridgewater depot and taking money, etc., on his counsel's suggestion, took refuge in the sheltering arms of his legal privilege, and said, "I remain silent." No explanation was made by him touching this matter. When a case rests solely upon the evidence of a witness who thus willfully closes the door to his general character, it would be ravishing a court's discretion to give credence to his evidence, in this case, because of his doubtful character and presumptive interest, born of his natural desire in his father's success.

The thousand dollar note, Exhibit B, was seemingly on a piece of pad paper, and reads as follows:

"$1,000. Bridgewater, March 31/92. For value received I promise to pay Ann M. Beal One Thousand dollars with use at 5 per cent. Chas. M. Beal."

Exhibit B was drawn on a piece of paper with two-inch unruled margin at top, and balance ruled across the paper only. Exhibit B is 5¼ inches long and 4½ inches wide. The writing is 2½ inches long and 4½ inches wide. Five indorsements in Ann Maria Beal's writing are on the back. They cover a space of 1½ inches by 4½ inches, and are as follows:

"Interest paid to April 1st, 93. 1894 Interest Paid. April 3rd, 95 one years interest Paid. Interest Paid to April 6th 1896. $5 five dollars paid July 12, 1901."

This evidence can be reconciled only upon the theory that the grandmother had in mind Exhibit B, and may have told the boy to tell his father that she wanted her interest on that note. In support of this is an interest indorsement on Exhibit B, dated April 3, 1895, and the boy's evidence that the note he saw was on a piece of pad paper. The indorsements on Exhibit B show that Ann Maria Beal could and did write as late as July 12, 1901. Mr. Watts, attorney, testified that she signed her affidavit to the inventory of the Sergant estate June 14, 1892, and July 20, 1893, wrote her name to her petition for an accounting twice, and to her account eight times. Why did she not sign the indorsements on Exhibit 2, if she ever received the money, particularly the last one, which purports to show a payment of $1,855 April 1, 1895? They say she drank tea and smoked freely, which made her nervous. It was a queer grade of tea and tobacco, and with freakish effects, which enabled her to indorse payments on Exhibit B from April, 1893, down to July 12, 1901, one of which was April 3, 1895, and wholly unfitted her to sign the memorandum of payment of $1,855 on Exhibit 2, April 1, 1895, only two days earlier.

Upon the entire case I am reluctantly led to the conclusion that the father, wife, and son, all interested, are engaged in a dishonest effort to reap where others have sown, and that Exhibit 2 is of scrub ances-

try, and is now a distorted, unnatural, perjury-poisoned product. No disinterested person in my judgment can examine it, in connection with the evidence, without reaching the same conclusion. The contestant's expert witness, Mr. Day, testified:

"There is nothing in the paper that shows that any indorsement was made across the folds. Where an indorsement is made across the lines, the ink will flow a little. I do not see any flowing of the ink in the fibers of the paper in the last indorsement. The way the folds appear here on the back of the paper, Exhibit 2, did not exist when the writing was made in my opinion. The second and third indorsements have the appearance of having been written at the same time, at the same sitting. The four indorsements were not in my opinion made with the same ink, out of the same small receptacle. That is my opinion and conclusion."

John W. Truesdale, of Syracuse, an expert of wide experience in handwriting, testified in behalf of the estate:

"After having examined Exhibit 2 under a glass, I find no evidence of having been written over a creased surface. In my opinion all of the indorsements on Exhibit 2 were written before it was folded. When folds are written over, the ink spreads in the broken fiber so it may ordinarily be plainly seen. The face and body of Exhibit 2 and all the indorsements thereon were written at one and the same time, and by the same person. Writings by the same person made at different times vary considerably, caused by the physical condition of the writer, and his pen control. I find no such variation in the indorsements and body of Exhibit 2."

Exhibit 2 has five creases which cut through different lines of the four indorsements, and yet there is not the slightest evidence of ink spreading in the broken fiber of the paper. The evidence as to the pen and ink used on Exhibit 2, which were both the pocket companions of the contestant in his school-boy days, seems incredible and Munchausen like to one accustomed to feed on truth and digest it with his food.

The courts have emphatically spoken in cases of this character where all the nourishment on which the contention is fed is furnished by members of the same family. In Matter of Stevenson, 86 Hun, 325, 33 N. Y. Supp. 493, the court said:

"Upon an accounting, the affirmative of establishing more assets than are acknowledged by the inventory and account is with the party objecting, and it should be established with reasonable certainty and not left to mere conjecture or suspicion."

To the same effect are Matter of Baker, 42 App. Div. 370, 59 N. Y. Supp. 121; Matter of Rogers, 153 N. Y. 328, 47 N. E. 589; Matter of Mullon, 145 N. Y. 98, 39 N. E. 821.

In Rix v. Hunt, 16 App. Div. 540, 44 N. Y. Supp. 988, cited in Matter of Arkenburgh, 58 App. Div. 583, 69 N. Y. Supp. 125, the court said:

"Where claims are presented against the estate of a decedent, they should be scrutinized with more than ordinary care in order to prevent, as far as possible, the allowance of unjust and fictitious demands against parties whose mouths are sealed by death."

In Van Slooten v. Wheeler, 140 N. Y. 624–633, 35 N. E. 583, 587, the court said:

"Public policy requires that claims against the estates of the dead should be established by very satisfactory evidence, and the courts should see to it that such estates are fairly protected against unfounded and rapacious raids."

To same effect Matter of Marcellus, 165 N. Y. 70–76, 58 N. E. 796.

In Matter of Goss, 98 App. Div. 489–491, 90 N. Y. Supp. 769, 771, the court said:

"It is proper to observe at the outset that claims of this character against the estates of decedents, especially when in favor of near relatives, should be examined very carefully and should only be allowed upon the most satisfactory proof."

In Roberge v. Bonner, 94 App. Div. 342, 345, 346, 88 N. Y. Supp. 91, 94, the court said:

"Contracts claimed to have been made by deceased persons to be enforced after death are to be regarded with great suspicion and the testimony upon which they are sought to be sustained closely scrutinized and the claim should be allowed only when established by strong and convincing evidence. * * * They are the natural resort of unscrupulous persons who wish to despoil the estates of decedents."

In Rosseau v. Rouss, 180 N. Y. 116–120, 72 N. E. 916, 918, the court said:

"Thus the evidence relied upon to establish the contract is, first, the testimony of the mother, who tried to swear $100,000 into the pocket of her own child; and, second, the testimony of witnesses who swear to the admissions of a dead man. The former is dangerous, the latter is weak, and neither should be acted upon without great caution."

The following applies to evidence of Adelbert Beal regarding his conversation with his grandmother as to Exhibit 2, without which the contestant cannot succeed:

"This was a casual conversation about a matter in which he was not interested. Such evidence of distant conversations has always been regarded as the most unsatisfactory and unreliable evidence." Van Slooten v. Wheeler, 140 N. Y. 624–631, 35 N. E. 583, 586.

The rule that a fact testified to by a disinterested witness who is not discredited which is not in conflict with other evidence is to be taken as legally established is not applicable to a claim made against a decedent's estate, since the person who could contradict the witness if his testimony be false is dead. Hughes v. Davenport, 1 App. Div. 182–184, 37 N. Y. Supp. 243, 244. "In all classes of cases the rule that the evidence of a disinterested witness is to be believed is subject to the qualification that his story must not be improbable." Walbaum v. Heaney, 104 App. Div. 412, 93 N. Y. Supp. 640. "It is a maxim well known to the profession that, if a witness willfully and corruptly swears falsely to any material fact in the case, the court is at liberty to disregard the whole of his testimony." 29 Am. & Eng. Ency. of Law (1st ed.) 780, and cases cited.

It is claimed that Ann Maria Beal received $385 from the sale of some real estate belonging to the Sergant estate. In the Sergant estate she had a life use, with no power of sale; hence if she sold, and received money for the land, it was not in her capacity as executrix. That being so, this court has no jurisdiction to compel payment out of her estate into the Sergant estate of any amount received by her in

any other capacity than that of executrix. It has been repeatedly held that the surrogate has no power to direct or control an administrator as to property to which he did not have title, or of which he had no right to take possession as administrator. Matter of Kane, 38 Misc. Rep. 276–282, 77 N. Y. Supp. 874, 878, and cases cited. "A Surrogate's Court has no jurisdiction over realty left by a decedent, or its avails, unless brought within it by a will, or by a statute for the purpose of being dealt with for some special purpose, like the payment of debts in case the personalty is inadequate." Sweeney v. Warren, 127 N. Y. 426–435, 28 N. E. 413, 415, 24 Am. St. Rep. 468.

The burden of proof is on the contestant, and he has wholly failed to establish with reasonable certainty that the account filed herein should be surcharged with the amounts as claimed by him.

A decree may be submitted, passing and settling the account as filed.

Decreed accordingly.